I would like to welcome you all to this oral argument for case number 124-2199, consolidated with 124-2273, Stephanie Salcedo v. Johnson & Johnson, etc. You'll see on your screen with me my colleagues, Justice Michael Hyman and Justice Sylvia Gamreth, and we are set here for oral argument on this case. Our rule of thumb generally is we give everybody 15 minutes. We try to not interrupt you so you can get your best points forward, and we urge you to start with your best points, remembering that we've read the record, we've read the briefs, and we've studied the cases that you've cited. So you don't need to be too repetitive on that, although I know you need to set your fact situation the way you want it set. In addition to that, we've asked the appellant to reserve some time for rebuttal. And with that, I will let the appellant's attorney first introduce him or herself. Great. Thank you, Justice. It's Mike Skodro. May it please the court and counsel. I'm here on behalf of the defendant's appellants on this matter. I would ask to reserve, as you mentioned, five minutes for rebuttal, if that's acceptable to the court. Okay, fine. And the appellant's attorney, is that you, Ms. Shirley? Yes, Your Honor. Lisa Shirley, representing Stephanie Salcedo and the Garcia family. Okay, fine. Now we know who everybody is. With that, Mr. Skodro, please begin. Sure. Thank you very much. And again, may it please the court. The trial in this was fundamentally unfair and a new trial at a minimum is required. That or remitted, as I'll mention in a minute. This case centers on whether Ms. Garcia was exposed to asbestos from J&J baby powder. We know the facts. Let me ask, you make several arguments. Yes, Your Honor. Numerous. Which one do you think, and I'm not saying any of them are weak, but some are stronger than others. I'll put it that way. Which, tell us about, let's start with the strongest. What do you think is the one that will get our attention and is the winner for you? Well, thank you, Your Honor. So we obviously chose the order in the brief, certainly reflecting our thoughts on our arguments. I would say that the remitted argument, there are really two that I think are neck and neck for us, Your Honor, to be honest. The remitted argument is a pure error of law that the plaintiffs here ask this court to be the very first to do something that is inconsistent with Illinois law, dating back to Dillon, when this cause of action was first recognized for future injury slash diminished life expectancy. At the same time, with regard to the overall fairness of the trial, and while this requires a bit more look at what went on at trial than the remitted issue, the juxtaposition between Drs. Kuffner and Haber is really quite striking in terms of two different doctors, two different witnesses being subject or held to very different standards when it comes to admissibility of testimony and did so in a preside a very one-sided view of the core issue in this case, which is whether Ms. Garcia was exposed to asbestos in any of the Johnson and Johnson talk. And I'm happy to start with either of those or address those in either order, Your Honor, if the court has a preference. Well, why don't you start with remitted? Sure. Sure. So the remitted, to understand the Illinois law and remitted, it's actually extremely well laid out in what amounts to two cases. There've been some follow on jurisprudence as well, but two cases as well as the jury instruction notes, which include not surprisingly cite those two cases to explain what is the relatively new cause of action in Illinois for future damages and again, slash loss of life, reduced life expectancy. So what Dylan explains that when the Illinois Supreme Court explained in Dylan is that, you know, look, citing Judge Posner for the proposition that, and I'll just quote it briefly, a tortfeasor should not get off scot-free because instead of killing his victim outright, he inflicts an injury that's likely though not certain to shorten the victim's life. And citing that phrase from Judge Posner favorably, the Illinois High Court in Dylan in 2002, recognized that there ought to be an ability for plaintiffs who can show that they are likely to experience exacerbated or more extreme damages down the road and or shortened life expectancy down the road, that they ought to be entitled to recover that because in the alternative, even though this is a prospective future contingent event, if they're allowed, they ought to be allowed to convince jurors to provide even a discounted amount for that contingency based on what the jury believes may occur and the likelihood of its occurrence, because otherwise under the single recovery principle, the fact that you can only bring your lawsuit once, otherwise there would be no way to recover for that future contingency. And so, and then we have the Bower decision, again, discussed in the brief from the Fifth Circuit, Fifth District, excuse me, that expounds on that same rationale from Dylan, makes clear in language that I think could not be more concise, frankly, that a plaintiff can recover for damages for decreased life expectancy in a non-wrongful death case, because that is the sort of case that poses the issue that Judge Posner, the conundrum he presented and that the Supreme Court and Dylan aimed to fix. And the jury instruction itself, the comments that accompany it made clear that the cause of action for shortened life expectancy follows from Dylan, follows from the Fifth Circuit's, Fifth District's decision in Bower. And the comment itself is all written in terms of, as it ought to be, given that this is a cause of action that exists solely. But going to the, that's not what we look at, that those comments are different than the cases. And tell me where in those two cases, Dylan and Bower, because I've looked and I don't see it, but maybe I missed it, that it says that a plaintiff must be alive to seek damages for shortened life expectancy. Where are those cases say that? Well, Your Honor, Bower says it when it says that a plaintiff can recover in a non-wrongful death case and the very purpose. And so that's the language of Bower. This was a, this, but the facts in both Dylan and Bower are different than what we have here, aren't they? Well, Dylan and Bower both involve living plaintiffs, but they were creating the same, the cause of action is the same. This cause of action for shortened life expectancy, this cause of action for a future contingency. And frankly, it's not just the language of Bower that controls here. It's the fact that the tort itself is a complete square peg in a round hole. It's designed to, if the individual has already deceased prior to trial, the cause of action exists. As these cases make clear, it exists to prevent the possibility of facing a provable likelihood of premature death or exacerbated injury without- That's what we have here. When the facts showed she was well aware that she was, she died with, I think, six months after diagnosis and she knew and her family knew. So there is factual evidence here. And so since there's evidence of it, and it doesn't seem that anything in the statute, the Survival Act would limit that. You can't point to anything in the Survival Act that would limit the shortened life expectancy damages, do you? The Survival Act doesn't speak one way or the other, Honor, but let me take the other aspect of this same cause of action that Dylan created, which would be future medical expenses. So is there any doubt that if someone sought and obtained or sought future medical expenses for a deceased plaintiff, that even though those aren't discussed one way or the other in the Survival Act, those are part and parcel of the same two cases, Dylan and Bauer, that have given rise to the shortened life expectancy. Were that asked in this case? That's not part of this case. No, correct. And they couldn't, Your Honor, that's the whole point. Had they asked for future medical expenses on behalf of a deceased victim, the court would have had no trouble saying, well, of course you can't recover that. Yes, had you been living, you could. It's not an issue, but that's not the issue. So, I mean, you're using, you're taking it, I mean, I understand where you're going with the argument, but let's keep our eye on the ball rather than on something else that's not really an issue. No, so let's take this court's decision in Jefferson, the first district, right? So, Jefferson was a case where someone did seek those future damages just as if, and again, these two are joined at the hip, just as if they had sought damages for shortened life expectancy. The individual passed away prior to judgment and the court wiped clean all of those future injuries. Now, had they accrued under plaintiff's theory? Yes. Under plaintiff's theory, that those claims had accrued for the living plaintiff, Jefferson came out the wrong way, according to plaintiffs, because they would have to say that that's something encountered by that was a claim that accrued on behalf of the living plaintiff and they ought to be entitled to it by virtue of the survival act. And let me be clear. What you said, what you just said, I don't mean to interrupt, but we're having a conversation. Yeah, of course. I want to keep you, and we only have so many minutes, but what you said is correct. They asked for future damages. That's right. They asked for future damages. That's not what's being asked here. Here, they're asking for shortened life expectancy damages. And throughout your brief, you seem to combine those two, the word future with shortened life expectancy. They are different concepts. And so in answer to the question, Jefferson does not, it had nothing to do with it. The person was alive. It just so happened they died when the jury was out. I mean, the chances of that, but that's what happened. So they didn't ask for it. Here, she lived through this period of time and they asked for it. So there's a big difference between the two cases. There is no case. Are you aware of any case that's on point in Illinois on this issue? I mean, I assume if you had one, you would have. Sure. No, exactly. You're both very good lawyers. So we all knew and we've discussed the fact, you know, this has never come up. I mean, we have the question, why hasn't this come up? Let me, good question. Well, I think it's not come up because I'm not aware of this ever happening before where you have both a wrongful death and at the same time you have shortened life expectancy. And let me be clear, Your Honor, they did, you mentioned a moment ago, this notion that Ms. Garcia experienced the knowledge that her life would be shortened by this disease. Let's be very clear. That is not what they sought in the form of shortened life expectancy. They asked for damages for her pain and suffering, including that knowledge, and received it. And that award is not being challenged as part of the remitter. We're talking about an entirely separate cause of action. And by the way, they also asked for and received, and I think Your Honor alluded to this as well, they also asked for and received damages for the knowledge or the loss of those 30 years on the part of the next of kin. They asked for and received that in the form of the $12 million wrongful death judgment. So what we're talking about here is something entirely different from either of those, something that doesn't exist. And again, the reason that I'm talking about Jefferson, the reason I'm talking about Bauer is because, and again, as 300405 makes clear, and I understand that's not binding authority, but as the instruction correctly makes clear, all of this exists, this notion of seeking collection for a contingent future premature death or injury, all of that arises from Dillon. And Dillon is very clear that the reason they're doing this is so that the living victim or the not yet severely injured victim can recover prospectively, because otherwise, there's no wrongful death action. There's no ability for this plaintiff to collect on what may be a more severe injury down the line. All of that goes by the boards. And again, quoting Judge Posner as the motivating language in Dillon, that would be unfair. But that's why I'm pairing the two, Your Honor, because the courts have paired the two. You said it's very clear. If it was so very clear, we wouldn't be having this conversation. So you have to agree with that. Of course, Your Honor. But what I mean to say is that everything is in sync. Dillon and Bauer, and again, Bauer really could not be clearer. These are the same, this cause of, and this is how other states, as we've explained it, treat it too. The restatement in its comments, and Illinois follows the restatement, the restatement says exactly the same thing. It couldn't be clear. That could not be clear. The restatement says, in cases where you are entitled to a wrongful death claim, you cannot bring a shortened life expectancy claim as well. And again, the reason is obvious. It's Judge Posner's quote. It's Dillon. It's Bauer. You don't get to bring that claim that exists solely to ensure under the single principle that a plaintiff at day one is not deprived of the opportunity to seek recovery for something that may happen in the future. But you said this is a separate cause of action. Yes, Your Honor. Why shouldn't a decedent who lived months knowing her life was cut short, isn't that a harm suffered during life? Absolutely. And she recovered in full for that, Your Honor. But it's a different cause of action. It is. Let me be very clear. They don't dispute this in our briefs. They sought pain and suffering. I understand. And they obtained it. And of course, that includes the knowledge. But that wasn't under this, that was for the wrongful death. That was actually for the, it was a surviving claim. Survival, okay, right. It was, Your Honor. It was a survival act claim that they sought and obtained in full from the jury. I mean, the jury assigned the number for that pain and suffering. But that is not what we're talking about. No one is questioning under the remitted or argument. No one is questioning the entitlement of the plaintiffs to seek pain and suffering on the part of the family under the wrongful death act and on the part of Ms. Garcia under the survival act for the pain and suffering that she encountered, including, if not largely, but including certainly the knowledge that she was suffering from a disease that had a likelihood of shorting, shortening her life. There was full recovery there and that's done. The question. I don't want to beat this horse too. I want, because your time is running out, I just want to make sure you cover anything else you want to cover. Before you switch, I have one question. Here we have a plaintiff who sued. She dies after she filed a suit. Her estate takes over. Does that make a difference whether plaintiff. So under your interpretation, even though plaintiff may have sued properly when she was alive, once she passed away, the cause of action died with it. Is that what you're saying? Yes. Just as she was not entitled to bring a wrongful death claim as a living plaintiff, she would. And this is the restatement point. She would equally be unentitled or not entitled to bring a shortened life expectancy claim as a deceased plaintiff. That cause of action by definition exists to provide compensation because you won't have a wrongful death action if you're a living plaintiff, but yet you face this contingency of a potential future death. So yes, that's exactly right. And that's exactly what happened in Jefferson, Your Honor, your fact scenario. It just moved up a little. The death occurred during trial or just post-trial as opposed to during or prior to trial. I'd like to, at least briefly with my remaining time, touch on what is a fundamental unfairness in the way in which Dr. Kuffner, who was a corporate representative, was prohibited from speaking to things that not only were within the understanding and knowledge of the corporation, not opinions, but past facts, such as had the corporation received notice historically from the FDA, but he was also prohibited from speaking to things that were squarely within his personal knowledge. This is the gentleman, for example, who approved and signed the health hazard evaluation. And yet when asked basic questions at trial, like when you signed the health hazard evaluation, did you provide your thoughts about the worst case estimate based on the FDA findings? And I'm quoting from material that we cite in our brief. There was a sustained objection to that. And in contrast, you had Dr. Haber, who had been admitted under 213F as an expert to speak as a pulmonologist or as a retired pulmonologist to come in and speak. And yet he was asked questions that went well beyond the scope of a pulmonologist. And the net effect of this, and let me just put a quick footnote on the first part of that, and that is that if the court is concerned about a broad ruling with regard to Dr. Kuffner here, they also, as we point out, repeatedly opened the door by asking Dr. Kuffner question after question as to whether, as to what he had learned by looking through corporate documents in preparation for his testimony. But in contrast, returning to Dr. Haber, he was allowed to basically walk through numerous corporate documents, including documents from well in the past, things that Dr. Kuffner was not permitted to do. And the net effect, and this is obvious from the arguments as well by the plaintiffs, the net effect was that the jury was permitted to hear, again, the core of this case. Did this material even contain asbestos? And then how did, if so, how did J&J react? But the vigorous dispute over whether it even contained it, the jury heard a very, very one-sided view when there was an incredible amount. And I would urge the court to look, recite the proffer of evidence that Dr. Kuffner was barred from providing in court. Reading that, it becomes immediately obvious, not only that that ought to have been omitted, but that it's extraordinarily prejudicial in a case where the balance and the back and forth surrounds whether or not there was asbestos in this material and how the corporation handled things in response. So, I'm happy to discuss the other issues as well. I don't want to run over and I'd like to ensure that I keep some time for rebuttal as well. Any other questions? No, I think. Mrs. Skudra, how much time are you reserving? If the court would allow for five minutes for rebuttal. Okay, let's see how this goes. Ms. Shirley. Yes, thank you. Good afternoon. May it please the court. I would like to first start off with the text of the Survival Act because this entire shortened life expectancy damages issue can really be resolved by looking at the text of the Survival Act. And what it says is that actions to listed in the act, which is for defamation, specifically slander and libel. There are no other exceptions for damages actions in terms of those surviving to the estate. And this is what the whole purpose of the Survival Act is. As I'm sure the court is aware, this is a remedial statute. It's liberally construed so that we don't have just by virtue of someone's death, their tort claims abating. That is a policy decision that Illinois and pretty much every state has made that has a Survival Act. We want those heirs to be able to bring that action that their loved one would have brought on their own. And in fact, Ms. Garcia, she did bring this action on her own and then she passed away and her daughter, you know, brought wrongful death and survival action on her behalf. So you agree that there is no case on point? Well, I will. I agree with what your honor said earlier about Dylan and Bauer. They do not say that you don't get a shortened life expectancy damages in a survival case. They don't say that at all. They don't they don't address a survival case. But what we can glean from those cases is that they that such damages would be would survive to the estate. For one, Bauer says that these are personal injury damages. It's been recognized as an element of personal injury damages for 20 years, shortened life expectancy. And we know under the Survival Act that all damages, causes of action survive to the estate. There's absolutely no reason why this would not survive to the estate under Bauer that says we want to compensate because life itself has value. And that doesn't change just because the person died before they could recover those that element of damages. So is the key here the fact that she was alive when the case was filed? Is that what you're saying? I mean, not really. I mean, it's it is it was our it was the for purpose of this case, if she had passed away before a suit was on file, then this action could not have been brought, could it? I think it still could. I mean, her damages claims, as long as they were brought within the statute of limitations, they would still survive to her heirs. But in our situation, she did bring those claims while she was still living. No, no. But that's not my my hypothetical. My hypothetical was. That she dies and then her heirs file a wrongful death case. Yes, in that in that circumstance, all the causes of action that Ms. Garcia would have had, they still survive to her estate, that that would not make a difference in terms of these being available damages, just like pain and suffering damages or any other type of damages survive to the estate, even if the if the injured person is deceased by the time the claim Mr. Scarborough mentioned pain and suffering damages several times. How are they different than what we're talking about? Well, I think the easiest way to resolve that question is to look at Bauer. I mean, Bauer is a case that says that this is a separate element of damages. We reckon Illinois has decided these are recoverable as a different type of loss than pain and suffering or emotional distress or wrongful death. Those all compensate for different types of losses versus shortened life expectancy, which is its own unique loss and unique pain to lose, in this case, three decades of life. This is the other point I wanted to make, Your Honor, was that Johnson and Johnson keeps referring to this as future damages, and that is a fallacy. These are not future damages. They are a present injury. That is what is being compensated for. And Dylan instructs us on that very, very specifically. What Dylan says is that, let me find my notes on this. Dylan says that the increased risk of a future harm is itself a present injury, which should be as compensable as any other present injury. So these are damages that Ms. Garcia suffered during her lifetime, knowing she wouldn't be there for her family. What about Mr. Scardro's reference to the instructions? Yes. Okay. So, Your Honor, yes. Well, the instructions, for one, they do provide, obviously, shortened life expectancy is an element of damages under the pattern instructions. The instructions do not refer to these as future damages. There is a reference to a future damages instruction about how to calculate future damages, but the instruction doesn't say they're future damages. And if you go to that calculation instruction, which is 3401, it does not say, it lists all the types of damages that you would use that future damages calculation for. It does not include shortened life expectancy on that list of damages. How are the damages calculated here? $30 million, how is that calculated? Well, we obviously leave that to the jury, but the evidence was that her life expectancy, according to the mortality tables, is 30.1 years. She was 53 years old when she passed away. So, that was her life expectancy. There's also evidence that both of her parents, her mother still living and was 82 at the time of trial, and her father had lived into his 80s. So, she had a family history of longevity, and the mortality tables were in evidence that that would have been her expectation that she would have had a similar life expectancy. And does the instruction 3401 direct you to that as a form of future damages? I don't think that it does, because if you look at 3401, it doesn't say anything about shortened life expectancy damages. They're not listed by name or by IPI number. So, I know there's a note on use in 30.0405, but respectfully, I think that note on use is confused. Because if you look at Dillon, it doesn't say these are future damages. It says that this is a present injury and that these are present damages. And the notes on use, I'm sure the court understands, those are not the law. These are suggestions on use, but that's not binding on this court or anything. So, let me ask you, is this the new cause of action now? What would stop anybody who's been injured from filing this shortened life expectancy, and then if they unfortunately pass away, or already have passed away, filing for wrongful death? So, getting to Justice Hyman's point, are you saying that a injured person who passes away doesn't file suit, but the statute of limitations has not expired? Their estate can now file for both this cause of action for shortened life expectancy and wrongful death? Yes, Your Honor. Because those compensate for different injuries, obviously a wrongful death claim is for the injuries that the heirs suffer. Whereas the personal injury damages that survive to the estate are for Ms. Garcia's her own losses and damages. So, before this came into fruition, what would happen in the situation where a injured person files cause of action, they pass away before or during trial, what happens then? The estate picks up, they don't pick it up then, because there was, was there any cause of action to pick up on? And then would they file a separate wrongful death, or would one get extinguished or substituted? As I understand it, all claims do have to be brought together in the same action. That wasn't our case, and we didn't really brief this, but as I understand it, wrongful death and survival claims do need to be all be brought together in one case. If that answers your question. And so, without this cause of action, you're saying there's no other cause of action that would be distinguished should a plaintiff pass away midstream? Midstream, you mean while the case is pending? Yes. Okay, so I think if I understand what you're asking, I just want to know, is this creating a whole Pandora's box of new cause of action piled on one another, or has this always been the situation? So, I guess my question is, before this cause of action came to life, came into existence, what would happen? Would a cause of action be extinguished and another one substituted, or would you get to tap on other cause of action, namely wrongful death? Well, I think a little, if I understand your question, any claim for future damages, and so this was the Jefferson case, any claim for future damages would be extinguished upon the death of the plaintiff or the injured person, because as Jefferson points out, those damages are never going to come to pass. They're never going to actually be experienced by the injured person, which is different than shortened life expectancy, because that's a present injury that is experienced during their lifetime, and it's a separate element, you know, its own separate element, like pain and suffering, like emotional distress, that survives to the estate versus, you know, wrongful death, which is the heir's own injury. And just as I'm going to ask this, but I'm going to ask it again, shortened life expectancy is calculated based on mortality tables and so forth. I assume that there is some component of the pain and suffering and the distress of knowing your life is going to be shortened. So, how is this not duplicative of the other damages that were received, specifically for emotional distress or pain and suffering? Yes, Your Honor. Well, Illinois has recognized in Bauer and in our instructions, the pattern instructions, that this is a separate element of damages, that it's different than pain and suffering and emotional distress. Similar to we allow, and in this case, there were damages for disfigurement in addition to pain and suffering. You could say that disfigurement is kind of a pain and suffering, but there's been a determination that's actually a different kind of loss than pain and suffering. Similarly here, shortened life expectancy is really a different loss than just emotional distress. I mean, emotional distress can be anything related to having cancer, cancer that was caused by using, you know, a baby product. That would be extremely, you know, emotionally difficult, but that is separate from experiencing not having time with your family for three decades. That is a separate loss that Bauer recognizes as something we're going to compensate on its own. Any other questions, Justice Gamreth? Well, I would just say, do you have any response to Mr. Skagro's other argument that he raised with regard to the experts or the non-experts, as it might be? Yes, Your Honor. I definitely do have a response to that. So, in this case, Dr. Kuffner was appearing as a lay witness. He was designated as a lay witness. He was not designated as an for the type of testimony he is allowed to give. Obviously, a lay witness is required to testify based on personal knowledge. And beyond that, a lay witness under Rule 701 is specifically prohibited from giving opinions based on specialized knowledge, technical expertise. Unless they're designated as an expert, they cannot give expert opinions. And Johnson & Johnson chose not to designate Dr. Kuffner as an expert. I'm not privy to their reasons for that. He is a doctor. He's their chief medical officer. But they did not designate him that way. And that means he can't give expert opinions. The specific document that was mentioned before, the health hazard evaluation, in that document, there are expert opinions contained within that document that he was not qualified. He wasn't designated to give them and he wasn't qualified to give them anyway, because he didn't do the calculations. Those were calculations saying that there was a low risk of exposure from Johnson's baby powder, according to some FDA findings. That calculation, Dr. Kuffner admitted on the stand that he didn't do it and he didn't know about it. So not only is it an expert opinion to say that a certain level of exposure would or would not be causative of disease, but he also had no personal knowledge and no expertise to give that testimony. Contrast that to Dr. Haber, who, well, and by the way, let me just sort of also mention that Johnson & Johnson had its own experts. Obviously, it had experts that testified at trial. They could have talked about the health hazard evaluation and the conclusions of that. And they chose not to do that for their own reasons. But of course, Johnson & Johnson's experts gave all kinds of testimony about the causation or the lack thereof. So they were able, they were more than able to present that position. Whereas Dr. Haber is an expert witness. This is what he does. He's a pulmonologist. He was designated as an expert. He testified as an expert. So, of course, he was able to give expert causation opinions. And under the rules, he was allowed to explain the basis for those opinions. The case law is quite clear that under Rule 703, an expert, a designated expert can testify about their reliance materials, can testify that, you know, he has to explain in this case, for example, he's giving a causation opinion that Johnson's baby powder caused Ms. Garcia's mesothelioma. Well, he has to know what is in that baby powder in order to give that opinion. So to give, to know what's in the baby powder, he has to look at the testing. And he looked at testing from all kinds of sources, including Johnson & Johnson's own documents. But he's allowed to do that as an expert and to explain to the jury that is the basis for his causation opinion in the case. So there's... Thank you. Ms. Shirley, do you have any other additional points that you want to raise? I, no, I think that's it, Your Honor. Okay, fine. Thank you very much. Any other questions? Thank you very much, Your Honor. Let me just, I'll take these in the same order. And if I could start where Your Honor's questioning began. The plain language of the Survival Act does nothing to help plaintiffs claim here. Let me just put that to one side quickly. And they concede as much on page 16 of their brief when they can concede that future damages for medical expenses, for example, future pain and sod, that kind of thing, that those are claims that one would normally have. They're not listed. They're not carved out in the Survival Act. But clearly, we'd agree it would be nonsensical for those to survive because... But that goes to the point that there's a difference between future and life expectancy damages, shortened life expectancy. And if there is, if they're the same thing, then your argument is understandable. But if they're different, then their argument is understandable. So... Well, let me... Do you agree to that? I mean, that's one of the differences between the two sides. Sure. And let me address that squarely, Your Honor. This notion, I think Ms. Shirley said, we're talking about a present injury, not something in the future. And that, in my view, gives up the store on this argument. The whole point, if everything that could be current injury, and I think it was described even in terms of the knowledge that your life may be shortened, that is captured by pain and suffering. And indeed, many cases, including the second district in Fetzer that we cite in our brief in a slightly different context, but this notion of shortened life expectancy, the sort of pain and suffering that comes with that, courts all over the country, we cite many of them recognize that is a survivable pain and suffering claim, and they obtained that here. What the plaintiffs have been unable to answer is, well, what's the difference then? And I think that question was asked, but there's no real answer to, well, what's the difference between this shortened life expectancy and the pain and suffering and which is actually a present injury? And the difference is the shortened life expectancy is a cause of action created by Dillon and then subsequent cases for one purpose and one purpose only, and that is to compensate someone who may die in the future, but is still living at the time of trial. And that simply doesn't have any bearing here as the, and I do want to address, Justice Gamrath, your question, is this going to open Pandora's box? Absolutely. I think there's a reason we haven't seen these claims. And while the IPI may not be binding, the IPI certainly give us a very clear window into how practitioners in the bar have long understood this cause of action, and they understand it the way the restatement expressly understands it. And that is, it exists to address the contingency for future injury or future, a shortened life expectancy, because you can only bring your lawsuit once. We want to provide a remedy for someone who can tell and convince a jury that their life will be shortened. That does open a Pandora's box. When you break from the restatement, from the IPI, from Bauer, from Dillon, you're absolutely going to a monumental change. And I think my opponent was clear in saying, this is not limited to circumstances where the individual passes away during the course of trial. And it isn't. Nothing in their theory would limit it like that. This would be a brand new cause of action. And let me be clear, what happens if someone passes away? It's not that life isn't valued. Life is captured from the perspective of the decedent in terms of the pain and suffering that was asked for and obtained here. The value of life is captured from the perspective of the next of kin, the spouse, under the Wrongful Death Act, which springs into action the moment that the person passes away. And here, that was valued to the tune of $12 million, saying, yeah, we understand. This life has value. You're being deprived of time with someone who has passed away early. All of that is covered. There's been no doubt throughout the course of this argument as to what additional is added by this cause of action. And that's because the answer is our answer, and it's Dillon's answer. This cause of action exists for one reason, to compensate someone who faces the prospect of future death and ought to be able to recover for that, even though they're alive at the time of trial. And the Supreme Court could not have been clearer in Dillon. And that's exactly how the bar has understood it. I will just touch a sentence or two. I understand Ms. Shirley's argument, but the quotes I was giving, these were not asking for what were you thinking when you signed and authorized a, you know, this HHE that Mr. Kupfer oversaw. That is not a calling for any kind of expert knowledge. That is simply asking him a question. And to compare that to some of the things Dr. Haber was able to go through that went well beyond the scope of his 213F, which this court and others have always strictly construed, allowed the jury to see an extraordinarily one-sided view of the key critical fact issue in the case. I think I may have exhausted my time, Your Honor. Thank you. Any questions? All right. Well, in that case, we'd like to thank you both for your excellent moral argument and the briefs that you prepared. This court will take this case under advisement and we are adjourned on this case. Thank you.